Our final case of the morning is case number 117138, Ruben Walker v. Pamela J. McGuire, People X. Rel. Lisa Madigan, Attorney General, Intervenor, Appellant, and Cross-Appellee. Are you ready to proceed? Ready, Mr. Novoselsky? Good morning, and may it please the Court, Counsel. I am Illinois Solicitor General Carolyn Shapiro on behalf of the people. There's only one issue properly before the Court today, and it's a narrow issue. The issue is whether an unconstitutional judicial fee office was created by the preamendment version of section 15-1504.1a of the Code of Civil Procedure, imposing a $50 fee on plaintiffs who file foreclosure cases. Before I go on, I should emphasize, of course, that statutes are presumed constitutional and that plaintiffs in this case have brought a facial challenge, which is a particularly high bar. They must show that there is no circumstance in which the statute they challenge is constitutional. The statute itself here provides, as I said, that plaintiffs must file foreclosure actions, must pay a $50 fee to support the foreclosure prevention program. The statute provides that the circuit court clerk collects that fee, disperses 98% of it to the state treasurer for the foreclosure prevention program fund, and keeps 2% of it to defray administrative costs. In the preamendment version, administrative expenses related to the implementation of this section, which is the section setting forth the new filing fee. Whether or not this provision creates an unconstitutional judicial fee office is the only issue the circuit court decided, and thus it's the only issue on which the circuit court made the required findings under Supreme Court Rule 18. And there is no question that the circuit court was wrong. The statute does not violate the judicial fee office provision of Article VI, Section 14 for two reasons. First, Article VI, Section 14 does not apply to circuit court clerks. And second, even if it did, this statute would not create a fee office. Turning first to the application of Article VI, Section 14 to circuit court clerks. Section 14 has a heading. The heading is, Judicial Salaries and Expenses, Fee Officers Eliminated. And it then consists of three sentences. The first sentence talks about how judges will be paid by salary as provided by law. The second sentence talks about how the salaries and expenses of judges will be paid by the state, although it allows counties to supplement for judges in which jurisdiction they are. The third sentence, which is what the plaintiff rests his entire argument on, says, there shall be no fee officers in the judicial system. But that sentence must be read in its context. And its context, looking at the heading of Section 14 and the rest of the language of Section 14, makes clear that that section is addressed to judges, and specifically judges alone. It says nothing about the non-adjudicative members of the judicial branch. So the general language of that last sentence cannot trump the specific context in which it's found. And again, without going beyond the text of the Constitution itself, we can look at the overall structure of Article VI. There is another provision in Article VI, Section 18, that addresses the compensation of non-judicial members of the judicial branch. That section is entitled Clerks of Courts, and it explains that the General Assembly can provide for clerks to be elected or appointed, and it says the salaries of clerks and other non-judicial officers shall be provided by law. So Section 18 deals with non-judicial compensation, and Section 14, where the fee office language is, deals with judicial compensation only. However, even if there was the – oh, excuse me. In addition, we know that the judicial fee office provision of Section 14 is addressed specifically to judges and other adjudicative officers when we look at the history of the provision. As Conerva v. Weems instructed, it's proper to consider the constitutional language in light of the history and condition of the times and the particular problem the Convention sought to address. And here the history shows that the concern was to eliminate officials who have some role in litigation and some financial interest in the – excuse me, some role in adjudication and some financial interest in the litigation, in particular, masters and chancery. This actually dates back to the 1870 Constitution, which provided for masters and chancery who were special officers who took testimony and made recommendations to the court. They kept bad records. They drove up litigation costs. In 1962, the 1870 Constitution was amended to eliminate masters and chancery. It said so explicitly, and that is where the first fee office prohibition appears. The 1970 Constitution adopted that provision with no substantive change. It did eliminate the specific reference to masters and chancery for two reasons. One, because it was redundant of the overall prohibition on fee officers, and two, because salaried masters and chancery actually could be allowed, and the Convention wanted to make that clear. We have extremely clear history about this from the Constitutional Convention, cited at pages 13 and 14 of our opening brief. Finally, this court's precedent construing this provision, for example, in Grace v. Howlett, focused on adjudicatory officials who have a stake in the outcome of the litigation. That's what the judicial fee office provision was designed to address. It has nothing to do with fees collected by circuit court clerks. Even if Section 14 applied to circuit court clerks, however, there would be no fee office here. Each clerk has a circuit court clerk operation and administration fund as required by statute. That fund is used to offset court costs incurred, quote, in performing the additional duties required to collect and disperse funds to the entities of the state and local governments as provided by law, end quote. That's exactly what is happening here. The General Assembly has imposed an obligation on the circuit court clerk to collect and disperse some money and has allowed the circuit court clerk to put a small amount of that money in its fund that exists exactly for the purpose of defraying costs related to such duties. Does Crocker require that 100 percent of the fees be raised or implemented and administered within the court system itself? No, Crocker does not require that the fees charged remain within the court system itself. Plaintiffs claim that this is Crocker's holding, but actually what Crocker says is that the funds that are raised by fees on litigation must be used in a way that relates to the court system. It says nothing about who must maintain those funds, who must disperse those funds. And we can see that that, in fact, was not part of the consideration of Crocker  Ali is a case in which this court upheld a fee that went to the establishment of law libraries in every county. In some of those counties, the circuit court judges were responsible for overseeing the law libraries, but at least in the most populous counties, specifically in Cook County, that duty was actually assigned to the county board. Ali upholding this provision did not express any concern about the county board having responsibility for establishing and maintaining this library. Ali says nothing to suggest, nor does Crocker, that had the fee been instead given to, say, the Secretary of State as our state librarian for him to establish these libraries, that there would have been any problem. The concern in Ali and in Crocker was whether or not the fees related to the court system and had some connection to the purpose for which they were imposed. Also, your opponent seems to suggest that the prohibition of a fee office would mean that even the placing of some of the fees into the operations fund or the automation fund would be violative of the Constitution. I think that's what he's arguing. At times, I think that's what he's arguing. There's no basis to reach that conclusion. The reason why the fee office provision is in the Constitution is to avoid the improper financial interest of adjudicative officers. Even if we thought that applied to circuit court clerks, having the circuit court clerk place this money in a fund that is there to defray expenses creates no special financial interest on the part of the circuit court clerk. None of the concerns behind the creation of the fee office provision apply at all. And this fund that exists for exactly the purpose I've described has not been challenged by the plaintiff in this case. What is the standard of review for a violation of the right to obtain justice freely, and what does that mean, justice freely, under Article I, Section 12 of the Constitution? The plaintiff argues that the standard of review here is strict scrutiny. This is simply not what Crocker says. It's not what Crocker says. It's not what Boynton says. And it's not what Ehrengold says, the three cases that he relies on for the most part. In Crocker, the court said that the court explained that it had to, excuse me, that there is no right to litigate without expense, without reasonable expense. And it cited a whole host of cases that have upheld a whole host of different litigation-related fees, from fees to support law libraries, to jury-related fees that are not refunded, even if no jury is empaneled, to fees to file tax objections in all counties except those with more than a million residents. That was the Sanko v. Carlson case. There are numerous examples where this court has upheld litigation-related fees on a rational basis test. And Crocker itself evaluated the fee at issue for a reasonable relationship between the fee, which was a fee for divorce litigants, and what was being funded, which was a domestic violence program. The problem in Crocker was that the court did not find a rational relationship between the fee itself and its purpose. Now, Ehrengold goes on to explain that in a regular due process challenge to a tax, unlike the due process challenge in Crocker, there is not even the same necessity to show the reasonable relationship between the tax and the purpose for which it's been imposed. But Ehrengold certainly does not say that Crocker imposed strict scrutiny, and, in fact, Crocker did not. Now, Boynton is the only case to impose a strict scrutiny standard, but Boynton has nothing to do with access to the courts. Boynton has to do with fees for a marriage license. And in that case, the court concluded that that fee itself was particularly high, therefore impinged on the right to marry and imposed strict scrutiny for that reason. It distinguishes itself, Boynton, from Crocker's use of rational basis review because of the fundamental right to marry that's at stake. Is the Crocker issue before us? No, the Crocker issue is not before you. The only issue that is before you is the fee office issue, which does not involve any question about what standard of review should apply, does not involve the due process clause, the equal protection clause, or the uniformity clause. So it's not in fact in front of this court to decide that question. And why do you say that? Again, because this case is here as a Rule 304A appeal, and it's here in this court as opposed to in the appellate court because the circuit court found the statute unconstitutional, and so under 302A it could be directly appealed to this court. The circuit court found the statute unconstitutional on only one basis, the fee office basis. That's the only basis on which the circuit court made Rule 18 findings. It's the only basis on which it certified an immediate appeal under Rule 304A. For those reasons, we don't believe it would be proper. Now, having said that, there is everything you need in front of you to uphold the statute at issue here on a rational basis review. We have provided a rational basis for the statutes, and this court can and should it reach those questions, can go ahead and uphold them. However, what this court really cannot do at this time is make any rulings on any matter where further evidence would need to be introduced. The people have not had an opportunity to develop any evidence about whether an as-applied challenge would be appropriate, about any justifications for the new aspects of the statute that was amended in 2013, about which the plaintiff has never amended his complaint, and the circuit court expressly did not reach. So there are a host of things that have not happened in this case, so it would be improper to do anything other than simply uphold on a rational basis. I would like to say a little bit more about the timeline of this case, because it has been muddied up a bit in the briefing. So I would like to make clear exactly what has happened procedurally and why it is that the fee office issue is the only issue directly in front of the court and why it is that it would be improper to do anything other than uphold statutes on a rational, under-rational basis at this time. The original complaint is filed in October of 2012. At that point, the challenge is the statute as it existed, a $50 fee collected for a foreclosure prevention program, 98% sent to the state, 2% kept to defray the circuit court's costs. From January to February of 2013, there was a briefing on the plaintiff's motion for partial summary judgment and the people's motion to dismiss. In this briefing, plaintiff rested primarily on claims other than due process and uniformity, claims that it is now pressing in this court. In June 2013, the statute is amended, and at this point the statute clarifies that the disposition of the 2% is to go into the clerk's operations fund, and it adds additional fees in a new subsection, subsection A5. These fees are graduated. They are also imposed on foreclosure plaintiffs, but they are graduated depending on the number of foreclosure filings a plaintiff made in the prior calendar year. The money from these fees is split between the foreclosure prevention program fund and another fund, the abandoned residential property municipal relief fund. Plaintiffs do not amend their complaint at this time. This is a new statute. It is a new provision. Some of the money is used for something different, somewhat different from the original statute that they challenged, but nonetheless this complaint is not amended. In July 2013, the circuit court asked for supplemental briefing on, among other things, whether the amendments from the prior month have any effect on the issues before it. Again, the plaintiffs do not amend their complaint. In September 2013, plaintiffs and the people file supplemental briefing explaining the relevance or lack thereof of these amendments to what's in front of the circuit court. Plaintiffs do not amend their complaint. In November 2013, the circuit court issues its order, and at that time the circuit court said at page C593, the court was not asked to consider the amended version of statutes and this ruling is limited solely to the statutes pending in their form at the time of filing. And the court went on to say that those amendments had no effect on the ruling that it reached on the fee office issue. But during all of those months after the statute was amended, the plaintiffs never sought to amend their complaint. Nevertheless, in this court, plaintiffs are trying to challenge not only the preexisting subsection A with the original $50 fee, but also subsection A-5, creating the new fee, the graduated fee. This issue has not even been litigated in the circuit court. It is not even a part of the complaint as presented to this court. Therefore, it is not properly in front of the court to decide at this time. If there are no further questions, we ask that this court reverse the circuit court's holding of 5404.1A as unconstitutional and remand for further proceedings. Thank you. Take your time. It's a lot better than it was some months ago. Let me correct one mistake. Would you kindly identify yourself? I apologize. David Novoselsky on behalf of Plaintiff's Appellee Cross Appellant. I'd like to reserve three minutes of my time, if I could, for the cross-reply rebuttal, if I may, to please the court. And again, I apologize for not identifying myself. One fast question or one quick point. The statute says the fee was not simply for taking in the money. The legislation says the 2% is for implementing the efforts to implement the program. That is what we attacked it on, not where it went. We pointed that out both for the trial court and the briefs. Justice Tice said, well, so in other words, is that all they're attacking it on? The Solicitor General said that's all they're arguing is a straight 2% for collecting the money. No. The statute itself, and we pointed this out both in our briefs here and before the trial court, was for the purpose articulated for the time and the clerk implementing the program. We also pointed out that it creates an issue with the separation of powers since the clerk of court is a member of the judicial branch. This is a program implemented by the executive branch. Could I ask you two questions? Number one, when you say this, to be very clear, because it's been suggested that at some points in your brief you're referring to the amended statute. Which statute are you talking about right now? The only statute that was really before the court, the 2011 version, I think it was 11 when it was passed or 10, was amended before we ended up resolving the case. The people came in and said, look, Judge, it's the only statute before you, which is why the complaint wasn't amended. There is no longer a 2011 statute. There's a 2013 version, which now clarifies where the fee goes. So you're attacking the 2013 statute now? Yes. Even though your complaint was never amended, even though the trial court's opinion rejected any analysis of the 2013? We didn't amend it because the people's position and the trial court's position initially, once the statute was amended, in fact, if you look at their brief, their brief and even the argument today, if you go back and listen to the argument, the 2013 statute they say corrected and amended and clarified the 11th enactment. Just so that we're really clear what's in front of us. In your brief you said you, in quotes, amended your complaint. Did you ever file a motion or leave to file an amended complaint that was granted with an amended complaint placing before the trial court the 2013 statute? No. The court said it wasn't necessary. The court said we have a statute. Part of the problem is they don't have corporate. The court say it wasn't necessary when the court's order said it was not going to consider 2013? That was the final order. When we got the final order, if you look at the court's order prior to that, it says look, there's a 2013 statute. The people have come in with a brief or an argument. They actually came in with an argument saying judge, the legislature has now corrected this issue on the fee. The 2013 statute supplements and replaces the 2011 statute. At that point, the only statute before the court was the 2013 statute. So the people's position and the court's initial position in the briefing was I want to address the 2013 version. But in the order we're reviewing, the court is not engaging in any way the 2013 statute, correct? Well, it says it isn't. Our position, and that's why we appealed from it, the court was. We disagreed with the court's conclusion because the court, in reaching its conclusion, specifically asked for briefing on the 2013 version and the impact. It was the people's position in filing their brief was that whatever the fee issues were and whatever other issues were asked in the 2011 statute, the legislature, being aware presumably of the suit, corrected the issues, supplemented, and I believe there is authority to that effect when the statute is amended prior to the time a court rules. The version before the court, because I've had that same argument was made in other cases before the court, that the original statute becomes moot and you can't attack it anymore. So the people's position is we have a new statute. The court agreed. We have a new statute. We now have to look at the new statute. That was the final round of briefing. When the court entered its decision on the fee office, part of that was based on the people's claim that given the 2013 changes you just heard, now it's in the administrative fund that cures the problem. Mr. Novoselsky? Yes, sir. We have a number of cases that have come before us in which there is a statute that's been amended and the statute before us only affects the parties before us, and maybe a few other people in a similar situation where the amended statute has taken place going forward. Is there a standing issue? I mean, with regard to the plaintiff's cross relief and what you've been saying in response to Justice Tice's question, how do the plaintiffs have standing if their payments were made pursuant to a prior statute? The class, when it was certified, certifies a class of those who pay this mortgage foreclosure fee. The people never raise standing before the trial court as a defense. In other words, there were people who paid a fee, right? Yes. And that fee was paid pursuant to a 2011 statute, right? And while the case was still pending, paid pursuant to the 2013 statute. We attacked the concept, not just on the fee issue, but on the entire mortgage foreclosure concept of fees being taken out of the court system and being applied outside the court system for matters that weren't part of the court system, violating Crocker. And also further, we even raised issues dealing with the propriety of a general welfare statute being paid for by fees rather than by general revenue. While the case was pending, those fees were being paid. We were representing those paying the fees under the statute. That statute was amended before the court ruled. The class was certified by the court, and the court had before her a class of those who pay the mortgage foreclosure fee. But if you look at the 2013 amendment, it doesn't say we have a new statute. We're amending the existing 2011 statute. So you still have the 2011 statute as amended. Could I move on a little to another kind of key topic here? Yes. In your briefs, I don't see you engaging the state's argument that the definition of fee office in the judicial article is meant to mean a ban, a prohibition, on the collection of fees by adjudicatory actors. In other words, the abolishment of masters and chancery. Let me just say that the term fee office, of course, is not one that we use all the time. It's been banned for over 50 years. I'm not sure. The Constitution certainly doesn't define it. So I really am trying to get to what is the definition of fee office, specifically as it's used in the judicial article. I heard the argument this morning. Part of the problem there is if it doesn't bar adjudicative, then you revert to Article 9, which bars fee offices, period. When clerks of the court are in the judicial article, why aren't we just looking at the judicial article? In fact, you said they should. Because when the Constitution was amended, what the state's argument is, yes, the last sentence bars them with fee offices within the judicial system, but what they really meant was only adjudicative portions of the system. Now the sentence is completely redundant. That sentence means nothing because it's already covered, according to them, in the first two. Clerks of court are parts of the judicial system. The explicit language says no fee offices in the judicial system. Their argument, if you read their briefs, is clerks really aren't covered as part of the judicial system because they're non-adjudicative, which, therefore, would mean they're covered under the general ban under Article 9. Why is that true? Why is that true? The general ban, Article 9, is about local government, correct? I don't believe it's restricted. I think it just says fee offices. You have to go back and look at it. I haven't read it recently. It's interesting because I think that came up in Marx, where the recorder of deeds is a local office, and that was an Article 9 issue. There was some confusion originally whether it was Article 14. That was a typo, I think, in the original court order. And the general abolishment of fee offices is where, do you say? I don't think you have to go beyond Article 14. I'm saying Section 14 of the judicial article because what they're arguing is clerks, if you look at their brief, I saw the heading this morning, clerks are not part of the judicial system because they're non-adjudicative. Well, that's not what this court has said. So we know they're part of the judicial system. So what the state is arguing is the last sentence really is redundant because if it only bars adjudicative offices, which are the first two sentences, then you read the third sentence out of existence, which this court has said we don't interpret statutes by taking sentences or portions of the statute out and ignoring them. So I would respectfully submit that the obvious meaning of that was we do not allow fee offices in the system. And then we come back to the question of this legislation doesn't treat them as even earning a fee in the system because the legislation says you get your fee for your efforts in implementing this retail, you know, the housing program. I'm sorry, not the housing, the mortgage foreclosure counseling program, which we know is being done by the executive branch. So then what we're saying is they're non-adjudicative. You can charge a fee, but you can then take a judicial, a member of the judicial branch, and this court I think has been very clear that clerks are part of this branch, not part of the executive branch, not part of local government, and allow them to be paid a fee for what the branch pays, or in other words, administers. Is it violative of the Constitution for the clerk's office to take a portion of the fee and place it in its operations fund? I don't think where it's placed really is that significant. Pardon? I don't think that's really the determinative issue. I mean, I could try to make a lot out of it, but I think I'd really be insulting the court's intelligence to do that. I think where the money goes isn't the issue. It's what the money is taken for. This is money taken away. So this is not your fee officer argument. This is a different argument? No. The fee officer argument has always been you're paying the clerk of court a fee, which is barred by Article 14. So if it is a fee, and it is a fee office, you're then the legislation itself says we're doing this not for the purpose of letting you collect a fee even for what you're doing. We're allowing you to collect a fee for what you're not doing. In other words, you're not implementing the program. The legislation says we're going to take this 2%. If you read the statute, it's very clearly in there in our briefs. And it says you are getting this fee for your efforts in helping implement this program. And they keep saying, well, and then when they did the 2013 amendment, and, again, that's part of the problem. They said the 2013 amendment isn't before this court. But it is when it's a sense of where the fee is going. So it is and isn't before the court. It's all right because they're putting it within the administrative fund. My point is, what is it doing there? What is it being charged for in the first place? It's being taken away and given to the clerk for a function the clerk cannot do. So specifically, what is the language that you're challenging? For administrative expenses related to the implementation of this section? Yes. The section creates this counseling program initially. It also creates the municipal abandoned property fund because the 2013 amendment, which General Shapiro just referred to, Associate General Shapiro referred to, encompasses the 2% fee as it also impacts on the abandoned property fund. Now, the clerk of the court should have absolutely zero to do with implementing how a municipality spends money taken from court fees to cut down weeds. And yet that is exactly what the legislature said, and that's exactly how the legislature attempts to justify this fee. But, you know, I do want to spend a little time on the other concept, whether it's the original statute or the 2013 statute. This court can review a statute based on any grounds appearing in the record. This is a fee, and it should be strict scrutiny because that's exactly what this court said in Arngold when it discussed both Crocker and Boynton. Where does the word strict scrutiny appear in Crocker? It actually appears in Arngold. I'm asking you where it appears in Crocker. In Crocker they talk about standards, and in that case, their finding was that it has no rational basis. They could have decided on strict scrutiny. Where does the word strict scrutiny appear in Crocker? They're not. They're in Boynton. They're in Boynton. There's a discussion of strict scrutiny. The court's ruling is based on rational basis. The language appears in Boynton. And, interestingly enough, the language then appears in Arngold, which distinguishes Crocker and Boynton, saying those were cases dealing with protected rights, and that's a strict scrutiny standard. Now, clearly, access to the courts would be a strict scrutiny standard because it is a protected right. Although Crocker did not apply. I agree with the court. The court applied the lesser standard. It struck the statute anyhow. In other words, even under a lesser standard, that particular statute violated even rational basis. This particular statute does the same thing. We have a statute that says we're going to take litigant funds, which both the U.S. Supreme Court and this court says should not go. Crocker does have language saying you don't take litigant fees and apply them, use them for purposes outside of the court system that don't benefit the court. Crocker then examines. Crocker then examined the use there and saying that's too attenuating. You could virtually have anything. Arngold, if you remember, I think the argument the state originally made was that Crocker is no longer followed by the court. I believe Arngold said it is. I think the case this court announced, the pension reform case, focuses on an aspect here. What you have here is a court fee supporting what is really a general revenue obligation. We made that argument below, long before this court ruled in pension reform. I'm not even sure if the pension reform litigation had been drafted when we addressed this below. What the court does is it takes general counsel funds. In the 2013 statute, it takes money to be used to deal with municipal blight, which is clearly a general revenue issue. It takes that money and it says a small group, pure litigants, and we do know that access to the courts is protected. We take that money and we use it for that purpose. Our position was below. We argued it below as per the statute, 2013, the 11. We argued it when the court asked us to address that in the briefs. And we said you can't do this. You can't take court funds and use it for what's basically a general welfare purpose. You also can't take court funds and use them clearly outside the program. And we come back to both Crocker and Boynton, which say you can call anything helping the court. I think the analogy here was the legislature and the state argued that using these funds to clean up abandoned property lessens the possibility of crime, which means you'll have fewer cases in the court, and that benefits the court system. Well, if that's true, anything could be justified in taking court fees out of this system. I don't want to belabor this point, but Justice Tice asked this earlier. Aren't we dealing with a very narrow holding in this order that says this case is about Article IV, excuse me, Article VI, Section 14, and whether the language in the statute at issue creates a fee office? Then under holdings, the number two, the judge says, for the reasons set forth, it is a fee office. This holding is limited in its application to the version of the statute in effect at the time the case was filed. And then it goes on, Paragraph IV, the statute is unconstitutional on its base based on the creation of the fee office. Again, this holding is limited to the statute in effect at the time the case was filed. How do we get into the amended statute? Well, two issues. The court can deal with alternative bases to find the statute is unconstitutional on the fee issue since those were, in fact, briefed. You get into the 2013 because the court did rule on it. If you look at the courts, and we've laid it out in the briefs, the court specifically said, please brief the 2013 statute. But the order doesn't say that. It concludes that it didn't. We think the court made a mistake. And we pointed that out in our briefs. When the court asked, and again, we come back to the briefs before this court, the 2013 statute has been cited, was cited below as a basis to knock out the 2011 as well, claiming that the legislature in 2013 merely clarified the 11th statute. The trial court was asked to rule based on the 2013 version. And then the argument, the court then frankly forgot, I believe forgot that it had ruled that way. I believe the court has the power to look at it, and the court should. Otherwise, in theory, then, you take everybody who paid from a certain point up to 2013. This court could permit the statute to be an amendment, if appropriate, right now, which we would seek, because otherwise we're going to go through this again a second time. Did he rule on the record? Is there a record of this ruling mistake? Oh, the court's ruling. I'm sorry. Well, you said he forgot. No, she. Or she forgot. Her original order asking us to brief the 2013 statute is in the record. The briefs dealing with the 2013 statute, including its effect on the 2011 statute, are in the record. They're, in fact, in the briefs before this court. The arguments that the 2013 statute goes back and clarifies, not supplement, clarifies the 2011 version was argued today. So this is all here. We respectfully think the trial court, when she wrote her decision, made a mistake, which is one of the reasons we appealed for it. We believe her ruling was improperly limited in light of the fact that we spent a lot of time briefing the 2013 version of this statute as a replacement, if you will, for the 2011. And at the time we were briefing it, people were paying under the 2013 statute who were already class members and already before the court, and they were already defending the 2013 version. So you had the parties were before the trial court on the new statute, or the amended statute. The court was considering the amended statute. There's no question. You know, the argument is that the trial court never considered this. Thank you, Mr. Novoselsky. Your time has expired. I was just trying to answer your question. Justice Thomas, his question has been answered. Thank you. Thanks. Just a few quick points. Mr. Novoselsky suggests that this 2% fee that the clerk keeps to defray its costs has to do with implementation of the program. The statute quite explicitly says it's for implementation of this section. And this section, 1504.1, provides that the clerk collects this fee and then forwards it. Nothing in the section creates any fund. Nothing in the section creates any program. Those provisions are in the Illinois Housing Development Act. That is where the program is created. It's described. Its purposes and operations are set out. So the clerk has nothing to do with the operation of those programs. It simply takes in the fee and then forwards it. Second, the court order below, the court below ordered the parties to brief the question of what effect the 2013 statute had on the issues in front of it. It did not order the parties to brief the constitutionality of the 2013 amended version of the statute. And this idea that perhaps the court made a mistake when it reached its ruling saying it was considering only the unamended version of the statute, this is the first that idea has been presented. It's not raised in the briefs. And even to the extent that any aspect of the 2013 amendments could be deemed relevant, the clarification of where the clerk 2% goes, and there's nothing about the circuit court's order, about the record below, that would bring subsection A-5 before this court. That, again, is the graduated fee for mortgage foreclosure plaintiffs. And that is absolutely not before this court. It was not considered by the circuit court. Just out of curiosity, has the fees ever been forwarded? I'm sorry? Fees collected, the 2%, ever been forwarded? The rest of the 2%? Has the money been forwarded? Yes. That's not in the record. I have no reason to think it's not. All of this is subject to audit. This is a transparent system. So if it hasn't been, that should become readily apparent. Justice Tice, you asked about the judicial fee office provision and whether, in fact, it applies to the circuit court clerks. Again, I want to emphasize that plaintiffs are relying solely on one sentence taken out of context, ignoring its placement in the Constitution and ignoring the history behind why it came to be there, what it was trying to address. The local fee office provision, which is in Article 7, Section 9 of the Constitution, is wholly irrelevant here. That, in fact, is addressed only to local officials, and circuit court clerks are not local officials. They are state officials. But even if that applied for the same reasons that we've already explained, there would be no fee office here. There's nothing improper about the arrangement that the General Assembly has created. Finally, I want to emphasize that Crocker does not say that money except that money fees for litigation must remain within the judicial system. It simply is not in Crocker's analysis. Crocker's analysis is that the funds must be used for purposes relating to the judicial system. And here those purposes are very clear. There was an explosion in foreclosures. The courts were having some difficulty dealing with them. The foreclosure prevention project was created in order to help reduce the number of foreclosures that found their way into the court system. Initially, foreclosure plaintiffs have to give their defendants 30 days' notice before they file and encourage them to seek housing counseling. The fee that is used here goes to fund that housing counseling. The legislature has found that this has actually been effective at reducing the number of foreclosure cases that have otherwise been clogging the courts. And it's important to note here that most mortgage foreclosure plaintiffs are repeat players. This is not a sort of amorphous generally the court will work better benefit which the court upheld in Ali. This is a concrete benefit that many, if not most, foreclosure plaintiffs will enjoy. When they do have to bring a foreclosure action to the court, it will move more efficiently and expeditiously. If there are no further questions, we ask that this court reverse the circuit court's judgment. Thank you. Thank you. Anything else? I have a question. This is on your cross appeal. On the cross appeal as to whether or not our position is 2013 is here and it's still a fee issue. I apologize. The question the court asked was, and Mr. Shapiro just said now, well, the local, the bar on local officials, circuit court clerks are an anomaly under the Constitution. They're elected locally. They are part of the court system. But if they're not considered on fee office as part of the system, since they're elected locally and their salaries are paid by each individual county, they would come under Section 9 and under the bar on local officials in Section 9. So that's your fee officer argument. That's not about your cross appeal. That is the cross appeal because our position is the statute is still in firm. Part of our cross appeal was what issue was before the court, which was whether it's only the 2011 or the 2013. The 2013 theoretically modified the fee issue dealing with where the money goes. So our position is whether even if it's the 2013, which it is, it's in firm even as a fee office because it comes within, it would be under the bar under 9 rather than under 14. You've been asked not to consider your cross appeal, that the trial court ruled on one specific ground. Yes, ma'am. And that's what we have before us. Except this court has repeatedly said the issue is not what the trial court did. I mean, what the reasoning of the court was was whether the order was proper, that this court for an appellee, and again, this could be an appellee and I apologize, not cross appeal, but this court can consider any argument in support of the decision, even if the trial court didn't do it. So if the statute was in firm beyond simply fee office, if it was in firm as taking money out of the judicial system or as using, putting the burden on a small group that's really a welfare burden, this court could find the statute was in firm for that reason and affirm the decision on a ground the trial court didn't necessarily consider. In other words, the trial court ruled on a narrow basis. If the trial court could have ruled on other grounds that were argued, and here they were argued, here they're present in the record. No question about it. There's no dispute that we advanced all of these arguments. As to both statutes, even if there was only one or two, all of these were presented to the trial court. The trial court ruled on a short, selective ground. If you look at the argument saying there is no cross appeal, the comment was, well, they can argue this in support of their position, but it's better for this court to send it back and let the trial court consider these new arguments. Our point in our reply on the cross appeal was they weren't new arguments. They were there. The trial court simply chose not to rule on them. The court clearly considered them because they were brief. Thank you, counsel. Thank you for your time. I appreciate it. Case number 117138, Reuben D. Walker v. Pamela J. McGuire, People of the State of Illinois, Lisa Madigan, Attorney General of Illinois, Intervenor. We'll be taking under advisement is agenda number nine. Mr. Shapiro, Mr. Novoselsky, thank you for your arguments this morning. Mr. Marshall, the Supreme Court stands adjourned until tomorrow morning at 9 a.m.